UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

07 CV 259

------------------------------------------------x
TONI BRAXTON,                                    :

                       Plaintiff,        : No.

      - against -                           :

BLACKGROUND RECORDS, LLC, BARRY                  :
HANKERSON, and DOES 1 through 10, inclusive,

                      Defendants.     :
------------------------------------------------x

RECEIVED
JAN 12 2007
U.S.D.C. S.D N.Y.
CASHIERS

## COMPLAINT

Plaintiff Toni Braxton ("Plaintiff"), through her undersigned counsel, brings the following complaint against Defendants Blackground Records, LLC and Barry Hankerson (collectively, "Defendants") for breach of fiduciary duty, fraud and rescission.

### NATURE OF THE ACTION

1.     This action arises from a fundamental breach of trust and double-dealing by the former personal manager of plaintiff Toni Braxton – defendant Barry Hankerson. Prior to meeting Hankerson, Ms. Braxton had established a successful recording and performing career. She had received multiple Grammy Awards, including "Best New Artist" in 1993, and she had sold over 20 million albums through Arista Records. Like many creative artists, Toni Braxton placed trust in her personal manager to advise and counsel her in the building of her entertainment career.

2.     Barry Hankerson assumed the role of Ms. Braxton's personal manager in 1997. Described by many as the single most important person in a recording artist's professional life, a personal manager's duties include advising the artist on the record company with which to sign, helping the artist with the creative process, assembling the artist's professional team

31392054.DOC

(including accountants and lawyers), and interfacing with the artist's record company to ensure that the artist is treated as a priority. As Toni Braxton's personal manager, Hankerson had the fiduciary duty to represent and to advise her honestly and with professionalism and integrity.

3. Instead, Hankerson placed his own financial interests ahead of Braxton's and – through fraud, deception, and double-dealing – induced her to leave a lucrative deal with Arista Records and enter into an exclusive recording agreement with Hankerson's wholly-owned record company, defendant Blackground Records, LLC. Hankerson actively sought to destroy Braxton's relationship with Arista through underhanded "double-talk," telling Braxton that Arista was not interested in working with her anymore, while telling Arista that Braxton no longer wanted to record for Arista.

4. After convincing Braxton to seek a release from Arista of her remaining recording obligations, Hankerson – in order to discourage any other record companies from signing Braxton – persuaded Braxton to allow him to issue an immediate press statement stating that Braxton had signed to Blackground, even though no such deal had been negotiated. Hankerson told Braxton that such a statement was necessary for an artist of her stature because it would otherwise appear that Arista had "dropped" Braxton.

5. Hankerson then deceived Braxton into believing that he was actively "shopping" her to other record companies when in fact he knew that the press statement would discourage interest from other companies. Hankerson then told Braxton that no other record companies were interested in signing her to a recording agreement, and deceived her into believing that his record company was "the only game in town" for her. Because she had placed her trust in Hankerson, Braxton was duped into signing a multi-album deal with Blackground Records.

6. Apparently not satisfied with having defrauded Braxton into signing the recording agreement, Hankerson and Blackground thereafter engaged in an all-out campaign to deprive Braxton of her rights under the recording agreement. For example, knowing that Blackground was required under the recording agreement to pay to Braxton a $1 dollar advance on every unit shipped overseas, Hankerson lied to Braxton, telling her that Blackground did not have a foreign distribution deal to distribute Braxton's albums, when indeed Blackground had such a deal with German-based Edel Music. And, although the recording agreement requires Blackground to issue quarterly accounting statements, and though Braxton's first album delivered to Blackground has sold more than 600,000 units, Blackground has not rendered a single accounting statement to Braxton.

7. Moreover, after Braxton demanded that Hankerson cease serving simultaneously as her personal manager and head of her record company, Hankerson embarked upon a vendetta against Braxton, insisting that he continue to control her career, and refusing to communicate or cooperate with any of several personal managers Braxton thereafter sought to employ.

8. Furthermore, knowing that an artist relies on ancillary recording projects for financial support, Hankerson sought to thwart all such opportunities for Braxton, blocking or attempting to block various special recording projects for which Braxton had been approached, including a recording for the 2006 World Cup and a song in the motion picture *Diary of a Mad Black Woman*.

9. As a result of Hankerson's breaches of his legal and fiduciary duties, Braxton has suffered damages in excess of $10 million. Because the recording agreement with Blackground was induced by fraud and gross conflicts of interest on the part of Hankerson, and

because Blackground has materially breached the recording agreement, Braxton is entitled to rescission of that agreement.

10. In the alternative, Blackground and Hankerson are liable for breach of contract for their material breaches of the recording agreement.

## THE PARTIES

11. Plaintiff Toni Braxton is a resident of Fulton County, Georgia.

12. Upon information and belief, defendant Blackground Records, LLC is a Delaware limited liability company with its principal place of business in New York, New York.

13. Upon information and belief, defendant Barry Hankerson is a resident of New York County, New York.

14. Upon information and belief, each of the defendants is the agent of the other and/or is legally affiliated with the other as part of a joint venture or enterprise. Each of the defendants has acted within the scope of its agency to the other and/or each has approved and/or ratified the acts of the other. Alternatively, there is such unity of interest and ownership between them that their separate personalities no longer exist and an inequitable result would follow if the acts and obligations of one defendant are treated as that defendant's alone.

15. The true names and capacities of Does One through Ten are unknown to plaintiff, and plaintiff will seek leave of Court to amend this Complaint to allege such names and capacities, as soon as they are ascertained. Each of Does One through Ten is responsible in some manner for, and proximately caused, the damages complained of herein.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship among the plaintiff and the defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.

17. Venue is proper in this Court under 28 U.S.C. § 1391(a)(1) because the defendants reside in this District.

## FACTS CONCERNING ALL CLAIMS

### Braxton Builds Highly Successful Music Career

18. In 1991, Braxton signed as an artist with Arista Records. In 1993, her debut album, the self-titled *Toni Braxton*, peaked at #1 on the *Billboard 200*, and went on to sell over 10 million albums worldwide. Braxton received a Grammy Award for "Best New Artist" in 1993, and back-to-back Grammy Awards for "Best Female R&B Vocal Performance" in 1993 and 1994.

19. In 1996, Arista released Braxton's sophomore album entitled *Secrets*. One of the singles from *Secrets*, the hit "Un-Break My Heart," spent 11 weeks at #1 on the *Billboard Hot 100*. *Secrets* hit #2 on the *Billboard 200* and sold over 10 million albums worldwide. That year, Braxton won Grammy Awards for "Best Female Pop Vocal Performance" and for "Best Female R&B Vocal Performance."

### Hankerson Becomes Braxton's Personal Manager

20. In late 1997, Hankerson became Braxton's personal manager. He advised, helped to direct, and coordinated the development of Braxton's career and business opportunities, including her recording career. Hankerson acted as Braxton's representative in proposing, receiving, reviewing and arranging potential business transactions for her. Hankerson inserted himself into Braxton's relationship with Arista, communicating purportedly on Braxton's behalf with respect to all aspects of Braxton's recording career.

21. After Hankerson became Braxton's manager, Braxton negotiated a new five-album deal with Arista in 1998, with advances on the five albums totaling over $20 million. Arista released Braxton's third album, *The Heat*, in 2000, selling 4 million albums worldwide.

**Hankerson Breaches Fiduciary Duty and Induces Braxton to Sign Recording Contract**

22. In 2002, during the recording of *More Than A Woman* – Braxton's fourth album – Hankerson began attempting to drive a wedge between Braxton and Arista, fabricating creative disputes between Braxton and Arista over the selection of songs, producers and video directors. In fact, Hankerson was advancing his own personal agenda, refusing to allow Arista to engage certain music and video producers because of Hankerson's own personal vendettas and creative vision, rather than Braxton's wishes.

23. By early 2003, with three albums and substantial sums in album advances remaining under Braxton's Arista deal, Hankerson convinced Braxton that she should seek opportunities with another record company. Hankerson told Braxton that Arista executives said that Arista was no longer interested in recording albums with her because of her pregnancy and alleged creative differences. Braxton discovered in or about March 2004 that Arista had never made such a statement about Braxton, and that Arista had always been interested continuing the relationship.

24. In March 2003, Hankerson obtained a release for Braxton from any future recording obligations to Arista. Hankerson convinced Braxton to allow him to issue a press statement stating that Braxton was leaving Arista for Hankerson's own Blackground Records, even though no such deal had been negotiated. To obtain Braxton's consent to this press statement, Hankerson told Braxton that her career would be harmed if the public and music industry knew that she had become an "unsigned" artist.

25. In March 2003, Hankerson announced that Braxton had signed to Blackground. Hankerson knew that this announcement would discourage other record companies from making offers to Braxton, since it would mean that they would be forced to

"buy out" the non-existent Blackground Records agreement. Although Hankerson told Braxton that he would shop for a new deal for her at other record companies, Hankerson never had any intention of securing such a deal for Braxton, but instead was carrying out a scheme to induce Braxton to sign a recording agreement with Blackground.

26. In the following weeks, Hankerson told Braxton that he was seeking offers from other record companies, but that no other companies were interested. Hankerson pressured Braxton into believing that she needed to sign a recording agreement with Blackground Records, because, according to him, there were no other interested record companies, and that Blackground would represent a better deal for Braxton because Hankerson and Braxton would purportedly be "joint venture partners."

27. Under Hankerson's pressure and deception, Braxton signed a recording agreement with Blackground Records in or about May 2003 ("the Recording Agreement"), under which Hankerson stood to gain far more than Braxton. Although Hankerson represented to Braxton that the Recording Agreement was a "joint venture deal," allowing Braxton greater creative control than she had had at Arista, and a fifty percent share of profits, Hankerson never intended to perform his obligations under the agreement. But for Hankerson's misrepresentations and pressure, Braxton would not have entered into the Recording Agreement.

**Braxton Terminates Hankerson as Personal Manager**

28. After entering into the Recording Agreement with Blackground, Braxton became uncomfortable with Hankerson continuing as both her personal manager and owner of the record label to which she was signed, and she asked Hankerson to terminate the management relationship. Not wishing to lose the control he exercised over Braxton and her career, Hankerson at first resisted Braxton's request, but eventually told Braxton that he was willing to cease serving as her personal manager.

29. Hankerson's apparent acquiescence in the termination of the management relationship was short-lived, however, as over the course of the next several months, Hankerson and Blackground insisted on continuing to control Braxton's career, and refused to communicate or cooperate with any of the series of personal managers Braxton sought to hire.

**Blackground Materially Breaches The Recording Agreement**

30. Under the Recording Agreement, Braxton recorded and delivered to Blackground an album entitled "*Libra*," in the summer of 2005. Released to the public on September 27, 2005, *Libra* has sold in excess of 600,000 units to date. Despite the success of *Libra* and repeated demands by Braxton, Blackground has failed to render a single accounting to Braxton, even though under the Recording Agreement such accountings are to be rendered within 45 days after the end of each quarter.

31. Blackground has materially breached the Recording Agreement in several other respects, including:

(a) failing to pay various third parties who provided services in connection with the recording and promotion of *Libra* – including producers, musicians, dancers and crew members – thereby damaging Braxton's relationship with those parties;

(b) failing to secure clearances for the use of photographs and other artwork for merchandising by Braxton;

(c) telling Braxton that Blackground had no distribution deal to distribute Braxton's albums overseas (where Braxton enjoys enormous popularity) when in fact Blackground had entered into a foreign distribution deal for Braxton's albums with German-based Edel Music;

(d) failing to account and pay Braxton for foreign sales of *Libra*; and

(e)  refusing to provide Braxton with a copy of foreign license agreements.

## First Claim For Relief

### Breach of Fiduciary Duty

32. Plaintiff repeats and realleges paragraphs 1 through 31, which are incorporated by reference.

33. Defendant Hankerson, as the personal manager of Braxton, owed to Braxton a duty of care and loyalty in the performance of his responsibilities with respect to the career and business of Braxton.

34. Hankerson grossly abused his discretion as the personal manager of Braxton, and thereby deprived Braxton of the economic benefits of her talents and businesses and has done so on terms advantageous to Hankerson. Such conduct was burdensome, harsh and wrongful, and in violation of Braxton's reasonable expectation that she was entitled to Hankerson's loyalty.

35. Hankerson breached his fiduciary duty to Braxton, inducing her to seek a release from her Arista recording agreement by falsely telling Braxton that Arista Records no longer wanted her to record albums with Arista, and falsely telling Arista that Braxton no longer wanted to record albums for Arista. Hankerson actively discouraged other record companies from making offers to enter agreements with Braxton by issuing a false press statement that Braxton was already signed to Blackground. Hankerson deceived Braxton into believing that he was actively shopping for recording deals from other record companies, and then pressured Braxton into signing a less lucrative agreement with Hankerson's own record label under the pretext that no other companies were interested in signing her.

36. Hankerson and Blackground, as a direct result of Hankerson's breaches of fiduciary duty to Braxton, have been unjustly enriched and have damaged Braxton.

37. Hankerson and Blackground are obligated to disgorge the monies they have received from Hankerson's self-dealing and breaches of duty so that they do not profit from such breaches, and/or to pay damages to Braxton in an amount not less than $10 million.

38. The applicable statute of limitations is satisfied. These claims are brought within six years of notice and discovery of the violations and accrual of the cause of action.

## Second Claim For Relief

### Fraud

39. Plaintiff repeats and realleges paragraphs 1 through 38, which are incorporated by reference.

40. Hankerson defrauded Braxton by falsely telling her that Arista Records no longer wanted her to record albums for Arista. Having thereafter secured Braxton's release from Arista, Hankerson deceived Braxton by telling her that he was actively pursuing opportunities for her with other record companies, when in fact he was not.

41. Such misrepresentations and omissions of material fact were false when made, and were made with the intent to deceive Braxton and induce reliance.

42. Braxton justifiably relied upon these fraudulent representations and omissions to her injury, and has suffered damages in an amount to be proven at trial.

43. The applicable statute of limitations is satisfied. These claims are brought within six years of notice and discovery of the violations and accrual of the cause of action.

## Third Claim For Relief

### Rescission

44. Plaintiff repeats and realleges paragraphs 1 through 43, which are incorporated by reference.

45. The Recording Agreement between Blackground Records and Braxton should be rescinded because it was entered by defendant Hankerson – through Blackground – in violation of his fiduciary duties to Braxton, and it was induced by fraud. To induce Braxton to enter the agreement, Hankerson and Blackground misrepresented to Braxton that Arista no longer wanted to continue its relationship with Braxton. Having induced Braxton to seek a release from Arista, Hankerson misrepresented to Braxton that he was actively seeking recording opportunities with other record companies, when in fact he was thwarting any opportunities. Hankerson elevated his own interests above those of Braxton in convincing her that Blackground Records represented her only opportunity for a recording contract, and advising her to sign with Blackground Records.

46. The defendants' misrepresentations and omissions were of material fact.

47. Braxton justifiably relied on the defendants' misrepresentations and omissions, without notice or knowledge of their falseness, in entering the Recording Agreement, and was damaged thereby.

48. Such misrepresentations were false when made, and defendants made them with the intent to deceive and induce reliance.

49. Moreover, the Recording Agreement should also be rescinded because of Blackground's material breaches of the agreement, including: (a) failing to render a single accounting to Braxton; (b) failing to pay third party recording and promotion costs; (c) misrepresenting to Braxton that Blackground had no foreign distribution agreement for *Libra*; (d) failing to pay Braxton on foreign sales of *Libra*; and (e) refusing to provide Braxton documentation of Blackground's foreign licensing arrangements for *Libra*.

50. The applicable statute of limitations is satisfied. These claims are brought within six years of notice and discovery of the violations and accrual of the cause of action.

### Fourth Claim For Relief

### Breach of Contract

51. Plaintiff repeats and realleges paragraphs 1 through 31, which are incorporated by reference.

52. In the alternative to plaintiff's rescission claim, defendant Blackground Records is liable for breach of contract.

53. To the extent the Recording Agreement is not rescinded, the Recording Agreement is a valid, binding contract, establishing specific contractual obligations between Blackground Records and Braxton.

54. Braxton has performed all of her obligations to Blackground Records under the terms and conditions of the Recording Agreement.

55. Blackground Records has breached the Recording Agreement as described herein, including by failing to account and pay to Braxton monies owed under the Recording Agreement.

56. As a result of Blackground Records' breach of contract, Braxton has sustained damages in an amount to be determined at trial.

57. The applicable statute of limitations is satisfied. These claims are brought within six years of notice and discovery of the violations and accrual of the cause of action.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff Toni Braxton respectfully requests judgment awarding her:

(1) Monetary damages in an amount to be determined at trial, but not less than $10 million;

(2) A constructive trust over, and disgorgement of, the defendants' unjust enrichment in an amount to be determined at trial;

(3) Declaratory relief declaring the Recording Agreement void;

(4) Punitive damages in an amount to be determined at trial;

(5) Interest to the extent provided by law;

(6) Reasonable costs of suit, including expert fees; and

(7) Such other relief, including attorneys' fees, as this Court may deem just and proper.

Dated: New York, New York
       January 11, 2007

KAYE SCHOLER LLP

_____
Stanley Pierre-Louis (SP3634)
425 Park Avenue
New York, NY  10022
(212) 836-8000

Peter L. Haviland
Rhonda R. Trotter
1999 Avenue of the Stars, Suite 1700
Los Angeles, CA  90067
(310) 788-1000
*Attorneys for Plaintiff Toni Braxton*

## JURY TRIAL DEMAND

Plaintiff Toni Braxton requests a trial by jury.

Dated: New York, New York
January 11, 2007

KAYE SCHOLER LLP

_____
Stanley Pierre-Louis (SP3634)
425 Park Avenue
New York, NY 10022
(212) 836-8000

Peter L. Haviland
Rhonda R. Trotter
1999 Avenue of the Stars, Suite 1700
Los Angeles, CA 90067
(310) 788-1000
*Attorneys for Plaintiff Toni Braxton*